# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**TERRY SEWARD,**

    Plaintiff,

  v.                                                Case No. 17-CV-911

**NANCY A. BERRYHILL,**
   *Deputy Commissioner of Operations,*
   *Social Security Administration,*

    Defendant.

## DECISION AND ORDER REVERSING THE COMMISSIONER'S DECISION

Terry Seward alleges that he is unable to work due to migraine headaches and musculoskeletal issues. After the Social Security Administration denied his applications for disability benefits, Mr. Seward requested and received a hearing before an administrative law judge. The ALJ determined that Mr. Seward remained capable of working notwithstanding his impairments. Mr. Seward now seeks judicial review of that decision.

Mr. Seward argues that the ALJ erroneously discounted his subjective complaints concerning the limiting effects of his impairments, failed to include limitations stemming from his migraine headaches in the residual functional capacity assessment, and improperly discounted the medical opinions of his treating

medical providers. The Commissioner contends that the ALJ's decision is supported by substantial evidence.

The Court agrees with Mr. Seward. Because the ALJ failed to provide sufficient reasons for not believing Mr. Seward's subjective complaints of disabling symptoms and for not crediting the opinions of his medical providers, her decision denying Social Security benefits to Mr. Seward will be reversed and this matter will be remanded for further proceedings.

## I. Background

Terry M. Seward was born on August 31, 1971. Transcript 216, ECF No. 17-3–17-19. In 1994, having completed two years of college, Mr. Seward accepted a job at a factory working on an assembly line and driving a forklift. Tr. 72–73, 267. He worked there for about ten years before leaving in 2005 to become a state correctional officer. Tr. 267.

In 2009, Mr. Seward injured his lower back in a severe motor vehicle accident. Tr. 597. Around that same time, he began experiencing one to two migraine headaches each week. Tr. 53–54, 650. Mr. Seward aggravated his back pain when he slipped on ice and fell while exiting his work vehicle on February 21, 2011. Tr. 522, 597. The fall also resulted in injuries to his shoulder, neck, hip, and knee, especially on the right side. Mr. Seward underwent physical therapy and returned to light duty by April. Tr. 373–78. A few months later, he was back at work full-time performing his normal job. Tr. 395. Mr. Seward stopped working on October 15, however, because he thought his ailments were too debilitating. Tr. 216,

266, 473. On October 20, Mr. Seward presented to urgent care complaining about pain in his lower back and right leg and requesting a medical excuse from work. Tr. 473–80. The examining physician prescribed pain medication but refused to provide Mr. Seward a work slip, noting that there was no medical basis for being completely off work at that time. Tr. 479–80.

Mr. Seward never returned to work. Instead, in February 2013, he applied for disability insurance benefits and supplemental security income, alleging that he became disabled on October 15, 2011, his last day at work. Tr. 216, 223. Mr. Seward asserted that he was unable to work due to tendonitis in his right shoulder, a degenerative right knee, degenerative pain in his back and neck, a tear in his right hip, and migraine headaches. Tr. 266. After the SSA denied his applications initially, Tr. 80–99, and upon reconsideration, Tr. 100–123, Mr. Seward requested a hearing before an ALJ, *see* Tr. 140–41.

The SSA granted Mr. Seward's request, *see* Tr. 144–64, and held an administrative hearing on February 18, 2016, before ALJ Roxanne Kelsey, *see* Tr. 38–79. Mr. Seward was represented by an attorney at the hearing. Tr. 40. Mr. Seward testified that he first experienced migraines in 2009, but they became more severe after his fall at work in 2011. Tr. 53–54, 65. Mr. Seward did receive compensation for that work-related injury, but his insurance lapsed when he stopped working. Tr. 47–49. He continued seeing his primary care physician, paying out of pocket, but didn't get x-rays or seek follow-up treatment. Tr. 48–51. He also had to put off surgery due to lack of insurance. Tr. 63.

Mr. Seward further testified that, at the time of the hearing he was having between two and four migraines each week, each lasting for two to six hours, Tr. 47, and experiencing significant pain (an 8 or 9 on a 10-point scale) in his back and neck, right shoulder, right hip, and right knee, Tr. 55. Mr. Seward reported that during a migraine, he would lie down in a dark room. Tr. 47. He also would lie down to ease his other pain, spending about six hours each day lying down, Tr. 55–56; his medications didn't provide much relief, Tr. 54–55. Mr. Seward acknowledged not taking his narcotic medication on a few occasions, claiming he was sick at the time and unable to keep them down. Tr. 57–63.

At the time of the hearing, Mr. Stewart was living with his mother and step-father. Tr. 51. He reported being able to do some basic household chores, Tr. 52–53, but indicated that his parents did most of them, as well as the shopping and cooking, Tr. 65. Mr. Seward stated that he had problems driving due to flare-ups in his back or overall pain. Tr. 52. He also stated that he had difficulty sleeping at night. Tr. 64. Mr. Seward estimated that, given his symptoms, he could lift and carry less than twenty pounds, sit for about thirty minutes, stand for about thirty minutes, and walk for less than two blocks. Tr. 56.

The ALJ also heard testimony from Kathleen Doehla, a vocational expert. Ms. Doehla testified that a hypothetical individual with Mr. Seward's age, education, and work experience would not be able to perform his past work if he were limited to a restricted range of light work. Tr. 67–74. He could, however, work as an assembler, a spinning lathe operator, or an office helper. Tr. 74–75. According

to Ms. Doehla, all work would be precluded if the individual were off-task thirty percent of the workday, had three absences per month, were off-task for a few hours twice per week, or had to lie down during the workday outside normal, scheduled breaks. Tr. 75–77.

On April 12, 2016, the ALJ issued a decision applying the five-step evaluation process, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), that was unfavorable to Mr. Seward. Tr. 15–37. The ALJ determined that Mr. Seward suffered from five severe impairments but that he retained the RFC to perform a restricted range of light work, including his past jobs and other jobs that existed in significant numbers in the national economy. *See* Tr. 18–31. Mr. Seward requested review of the ALJ's decision by the SSA's Appeals Council. Tr. 372. On May 8, 2017, the Appeals Council denied Mr. Seward's request for review, Tr. 1–6, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

Mr. Seward filed this action on July 5, 2017, seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). Complaint, ECF No. 1. The matter was reassigned to this Court after the parties consented to magistrate judge jurisdiction. *See* Order, ECF No. 9; *see also* Consent to Proceed Before a Magistrate Judge, ECF Nos. 4, 6 (citing 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b)). It is now fully briefed and ready for disposition. *See* Plaintiff's Brief, ECF No. 18; Defendant's Memorandum, ECF No. 20; Plaintiff's Reply Brief, ECF No. 21.

## II. Standard of Review

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

In reviewing the record, this Court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v.*

*Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) and *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). The ALJ's decision must be reversed "[i]f the evidence does not support the conclusion." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569). Likewise, reviewing courts must remand "[a] decision that lacks adequate discussion of the issues." *Moore*, 743 F.3d at 1121 (citations omitted).

Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if her decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

### III. Discussion

Mr. Seward claims disability on account of migraine headaches and various musculoskeletal impairments.

#### A. Migraines

Mr. Seward alleged that he suffered from migraine headaches multiple times per week that required him to lie down in a dark, quiet room for several hours at a time. The ALJ determined that Mr. Seward's migraines constituted a severe

7

impairment, Tr. 20–21, but she didn't include a lie-down or off-task limitation in her RFC assessment, Tr. 22–29. The ALJ provided a number of reasons for not believing Mr. Seward's subjective complaints of disabling symptoms and for not crediting the opinions of his medical providers. Those reasons, however, lack support in the record. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) ("A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence.").

### 1. Supportability

The ALJ erroneously determined that the record did not support the severity of Mr. Seward's migraine symptoms. According to the ALJ, despite Mr. Seward's claim that his headaches began in 2009 and worsened following his slip-and-fall in 2011, the record showed minimal complaints of headaches prior to 2014. The earliest mention of headaches appears to be January 2011, when Mr. Seward sought treatment for nasal congestion. Tr. 505. Over a year later, Mr. Seward began complaining about headaches to his primary care physician, David M. Kelly, M.D., Tr. 555, and treatment notes from May 2012 describe "worsening migraine headaches" that were not alleviated by pain medication, Tr. 557. Though not mentioned explicitly, Mr. Seward's complaints seem to have persisted, as Dr. Kelley eventually referred him to a neurologist. *See* Tr. 650. The record therefore shows support for migraine headaches as early as Spring 2012.

Moreover, Mr. Seward provided a reasonable explanation for why he did not seek treatment until 2014: his headaches got worse. Mr. Seward testified that in

8

2009 he was experiencing two headaches per week, each lasting about three hours. Tr. 53–54. By January 2014, however, his headaches were more frequent (three to four each week) and more severe (lasting four to five hours). Tr. 650; *see also* Tr. 65.

The record after 2014 clearly supports Mr. Seward's migraine symptoms. In January of that year, Mr. Seward began seeing Amit Ray, M.D, complaining that his headaches caused blurred vision and some dizziness, photophobia, phonophobia, and visual scintillations. *See* Tr. 650–54. Dr. Ray diagnosed Mr. Seward with migraines and prescribed him Imitrex. Mr. Seward reported that his symptoms did not improve during follow-up visits with Dr. Ray in September 2014, December 2014, May 2015, and October 2015. *See* Tr. 655–77. In October 2015, Dr. Ray completed a Migraine Headache Medical Assessment Form in which he diagnosed Mr. Seward with intractable migraines without aura (a visual, sensory, motor, or motor disturbance) and without status migrainosus (i.e., a migraine lasting more than 72 hours). Tr. 1020–21. Dr. Ray indicated that Mr. Seward exhibited three to four headaches per week and that, when Mr. Seward had a headache, he needed to lie down in a darkened, quiet room for five to six hours to relieve his pain.[1]

Despite finding that the Migraine Assessment was consistent with Dr. Ray's treatment notes, the ALJ declined to adopt the opinions therein. The ALJ noted

---

[1] Mr. Seward's chiropractor, Daniel Hyatt, D.C., provided a similar migraine assessment in February 2016. *See* Tr. 960. The ALJ reasonably assigned no weight to Dr. Hyatt's opinion because Dr. Hyatt did not treat Mr. Seward's migraines and because Dr. Hyatt last treated Mr. Seward in 2011. *See* Tr. 25 (citing Tr. 443–61). Dr. Hyatt also was not an "acceptable medical source." *See* Social Security Ruling No. 06-3p, 2006 SSR LEXIS 5, at *3–4 (Jan. 1, 2006).

9

that an MRI of Mr. Seward's brain was normal, that Mr. Seward infrequently sought treatment with Dr. Ray, and that Mr. Seward never sought emergency or urgent care treatment for his headaches. Further, the ALJ found it suspicious that Mr. Seward claimed to experience migraines 15 to 24 hours per week but no treating source ever documented an observed migraine. Tr. 25–26.

The ALJ did not provide "good reasons" for rejecting Dr. Ray's opinion concerning the nature and severity of Mr. Seward's migraine headaches. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Social Security Ruling No. 96-2p, 1996 SSR LEXIS 9, at *11 (July 2, 1996); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).[2] *First*, the Migraine Assessment reflects that the MRI was used to rule out other possible causes of Mr. Seward's symptoms. *See* Tr. 1020. Thus, the negative MRI was actually consistent with Dr. Ray's migraine diagnosis. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). *Second*, the ALJ failed to recognize that, aside from one instance, Mr. Seward sought treatment as often as Dr. Ray suggested. *See* Tr. 654 (4 months), 659 (3 months), 664 (6 months), 670 (6 months), 676 (6 months). The ALJ's lay observation concerning the frequency of treatment therefore was an invalid reason for rejecting the treating source's opinion. *See Samuel v. Barnhart*, 295 F. Supp. 2d 926, 953 (W.D. Wis. 2003). *Third*, the ALJ improperly suggested that emergency care visits were necessary to prove disability and failed to

---

[2] In early 2017, the SSA eliminated the "treating source rule." *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). Those revisions, however, do not apply here because Mr. Seward's claim was filed before March 27, 2017. *See id.*; *see also* 20 C.F.R. §§ 404.1527, 416.927.

appreciate Mr. Seward's lack of insurance and inability to pay for treatment. *Finally*, the fact that Mr. Seward did not have a headache at the precise time of his doctor visits did not reveal anything about the frequency or severity of his migraines. *See Moon*, 763 F.3d at 721. Indeed, Mr. Seward did not claim to have a headache during any time (2/27/14, 4/29/14, 6/10/14, 6/30/14) he had a doctor appointment while he was keeping his headache journal. *Compare* Tr. 343 *with* Tr. 729; Tr. 352 *with* Tr. 732; Tr. 358 *with* Tr. 736; Tr. 361 *with* Tr. 740.

### 2. Credibility

The ALJ also improperly assessed Mr. Seward's character when she concluded that he was seeking narcotic prescriptions for secondary gain rather than pain relief. In February 2011, Mr. Seward was prescribed Vicodin after slipping and falling at work. *See* Tr. 523. He subsequently entered into a pain management contract with Dr. Kelley, who switched Mr. Seward to Percocet. *See* Tr. 553. Mr. Seward remained on narcotic pain medication for several years. *See* Tr. 767. In May 2015, Mr. Seward's urine drug screen was negative. *See* Tr. 766–71, 989–90. He admitted to not taking his medications and claimed to have been sick for the last two weeks and unable to keep anything down. However, Mr. Seward's doctors remained suspicious and recommended that he seek alternative pain management. Tr. 777, 993–94. Based on this single failed drug test, the ALJ concluded that Mr. Seward did not actually need narcotics to treat his pain. *See* Tr. 23–24, 26.

The ALJ's determination that Mr. Seward was seeking narcotic prescriptions for secondary gain is not supported by the evidence she cites. The ALJ indicated

11

that the record showed "repeated blood tests showing the claimant does not have narcotic pain medication in his system," Tr. 23–24, but she mentioned only the single negative screen from May 2015. The record does not reference any other negative drug screens. Similarly, the ALJ inaccurately determined that "there was no indication [Mr. Seward] actually took any of the prescribed medications he filled." Tr. 26. It can be inferred from the lack of another negative screen, in light of years-long prescriptions, that Mr. Seward was taking his medications as directed. *See* Tr. 583 (referencing "annual random urine drug screen"). Indeed, in June 2015, Mr. Seward's doctor noted that the recent drug screen was "appropriate." Tr. 766.

The ALJ also unfairly faulted Mr. Seward for being unable to tell a straight story regarding the negative drug screen. *See* Tr. 24. At the administrative hearing in February 2016, the ALJ confronted Mr. Seward about "a couple" negative blood tests. Tr. 57. The only negative screen Mr. Seward specifically remembered was the one from May 2015. *See* Tr. 57–63. He explained that he had been sick at the time and that he tried to take his medications but he was unable to keep them down. That is the same explanation Mr. Seward offered at the time of the negative screen nine months prior; his "story" was consistently straight.

The ALJ's questioning at the hearing and attempt to reshape the record to fit her decision shows that she did not believe Mr. Seward was a truthful person. Such determinations, however, have no place in non-adversarial administrative proceedings. *See* SSR No. 16-3p, 2016 SSR LEXIS 4, at *1 (Mar. 16, 2016)

12

(clarifying that "subjective symptom evaluation is not an examination of an individual's character").

### 3. Remedy

Overall, the ALJ failed to sufficiently justify why she did not believe Mr. Seward's testimony concerning the limiting effects of his migraine headaches and why she did not credit the opinion of Mr. Seward's treating neurologist. If Mr. Seward did need to spend several hours multiple days each week lying down in a dark, quiet room, then he could not have held a full-time job. *See* Tr. 75–77. The Court has not determined that Mr. Seward's testimony and Dr. Ray's opinion must be credited. Rather, the Court concludes that the ALJ failed to build an accurate and logical bridge between substantial evidence and her conclusion that Mr. Seward could perform a restricted range of light work after October 2011. *See Moon*, 763 F.3d at 723. If on remand the Commissioner determines that Mr. Seward's migraine symptoms and resulting limitations are supported by the record, then she should re-evaluate the onset date of that impairment and how it impacted his ability to work.

### B. Musculoskeletal impairments

Mr. Seward further alleged that he suffered from severe pain and limitation due to injuries he sustained in the February 2011 slip-and-fall. The ALJ determined that Mr. Seward had "severe" musculoskeletal impairments but found that the record did not support the degree of symptoms he alleged. Specifically, the ALJ reasoned, the record showed that Mr. Seward did not want to return to work after the fall, that Mr. Seward suffered from no greater than "minimal abnormalities,"

13

that Mr. Seward "was seeing his physicians with a secondary goal of obtaining narcotic pain medications," and that Mr. Seward could still perform his daily activities. *See* Tr. 26–28.

In analyzing Mr. Seward's musculoskeletal impairments, the ALJ never discussed the Musculoskeletal Impairment Medical Assessment Short Form completed by his treating chiropractor, Daniel Hyatt, D.C., in February 2016. Dr. Hyatt opined that Mr. Seward's impairments would cause him to be off task 30% of the workday and that he would be half as efficient as the average worker. Dr. Hyatt further opined that Mr. Seward could sit and stand/walk for about two hours in an eight-hour workday, that Mr. Seward needed four unscheduled breaks during an average workday, and that Mr. Seward would be absent from work three days per month due to his impairments. *See* Tr. 958–59. According to the vocational expert, such limitations would be work preclusive. *See* Tr. 75–76.

The Commissioner argues that the ALJ's failure to address the musculoskeletal parts of Dr. Hyatt's opinion was harmless "because her decision made clear that she discounted those opinions because Dr. Hyatt had not treated Plaintiff for several years." Def.'s Mem. 11 (citing Tr. 25). The Court respectfully disagrees. The ALJ did mention Dr. Hyatt's treatment relationship in the context of his Migraine Headache Medical Assessment, but her decision contains no discussion whatsoever of the Musculoskeletal Assessment. The Court is not convinced that a five-year break in treatment alone is a good enough reason to wholly discount the work-preclusive opinion of a treating source, especially given the ALJ's finding that

14

several of Mr. Seward's musculoskeletal impairments were "degenerative." Moreover, given the issues identified above concerning Mr. Seward's migraine headaches, directing the Commissioner to also re-examine Dr. Hyatt's Musculoskeletal Assessment would not be "a waste of time and resources." *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

## IV. Conclusion

For all the foregoing reasons, the Court finds that the ALJ erred when assessing Mr. Seward's migraine headaches and analyzing the musculoskeletal opinions of his treating chiropractor. Based on this record, however, the Court cannot determine whether Mr. Seward was disabled as of October 2011. Accordingly, the Court concludes that it is necessary to remand this matter to the Commissioner for reconsideration of the ALJ's RFC assessment and, potentially, her step-four and step-five findings.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the Commissioner's decision is **REVERSED**.

**IT IS FURTHER ORDERED** that this action is **REMANDED** to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this Decision and Order.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 6th day of December, 2018.

**BY THE COURT:**

*s/ David E. Jones*
DAVID E. JONES
United States Magistrate Judge